Mr. Varhola, you may proceed Morning, your honors. My name is Steve Varhola. My client is Mr. James Osborn, the plaintiff appellant. Your honors, this matter is a classic case of fraud involving the sale of property that was contingent on the inclusion of a three-year right to repurchase on specific terms. The issue in this matter is that the sale terms themselves were in writing. The right to repurchase was an oral agreement between Mr. Osborn and the defendant appellee, Mr. Purlee. The terms, as we see them, were a three-year guaranteed right to repurchase. The repurchase price was $3 million plus 10%. Is there a conflict about the three years? Your honor, that is an issue in this matter. I believe that the trial court has improperly determined that it is a dispute. I believe that it is our position that whether or not it's a two- or three-year is an issue of fact. That could not have been determined at the trial court level. Such an issue, which is, I believe, the primary issue in this matter, should have been decided by the jury. Is there a conflict on the factual background of that, even from your client? I don't believe so, your honor. I believe that it is a case of differing opinions and conflicting testimony from Mr. Osborn and from Mr. Purlee. And I believe the fact that you have the conflicting opinions is why that decision could not have been made at the trial court level. And I believe, which gets at the first error of the trial court, the trial court fed this dispute by making that decision. When you look at the record and you look at the scope of this purchase, the decision that the parties did not agree at the time of the sale, as to the length and the repurchase price, it defies logic. We're talking about a transaction that's in excess of $3 million. We're talking about a piece of farm property that has been held in Mr. Osborn's family for generations. There are a lot of trials that defy logic. That's not uncommon. I would agree with that assessment, your honor. But I believe in this situation, it is very important that the court realize that. There's no contest that Osborn at one time said that they were no longer interested in getting the property back. Isn't that right? No, that is not correct, your honor. There's a contest about that. I believe there is a contest, your honor. I believe we need to put things in perspective. The deal, the ultimate purchase, the sale, occurred in March, April of 2000. That's when the parties actually solidified the deal, sold the property. At that time, Mr. Perley affirmed and reiterated to Mr. Osborn in front of his son that, I will adhere to our oral agreement based on the terms that we agreed to, the three-year and the $3 million plus 10%. Now, advancing forward two years, Mr. Perley approaches Mr. Osborn and indicates to Mr. Osborn, your right's about to finish. It's about to come up, your two-year right to repurchase. Mr. Osborn's position is, no, it's not. It's always been three years. The parties discussed the possibility of possibly meeting, maybe putting down terms and writing for a purchase, which leads us to the March 5, 2002 meeting, your honor, which I believe addresses where you are getting. Mr. Osborn sat down with Mr. Perley. Mr. Perley had operating costs and notes in front of him, indicating to Mr. Osborn, this is how I want to sell this property. Mr. Osborn attended that meeting, and rightfully so. Mr. Osborn was concerned. Wait a second, Mr. Perley's not going to honor our agreement. I'm not losing my property, so I will sit here, I will listen. They discussed potential price terms. At no point did they discuss the length of the right to repurchase. There is nothing in the record that would indicate that these parties, when they met on March 5, 2002, were there to ultimately decide Mr. Osborn's right to repurchase. They were there to discuss the sale. A few days later, Mr. Standard, who was present at that meeting, took the terms that were discussed and put them into an articles of agreement. The articles of agreement, when you look at them, are basically a sale of land. It's a contract for sale of land. By no means can it be construed or considered an option to repurchase. There's a down payment listed in there, Your Honor. There's earnest money listed in there. Contains a default provision. Default provision basically provides remedies if one does not purchase. I believe that that mitigates against an option to repurchase. A day later? I'm sorry to be interrupted, but you agree that that March document, and I think the trial court found that to be in accord. In other words, there was an agreement signed by both parties, and that agreement basically amounted to a contract for the sale of land, which would amount to maybe an exercise of the option to repurchase. Your Honor, I would disagree with that extensively, and I do apologize. I'm going to try to answer both Justices' questions. I believe on March 8th, Mr. Perley came in to Mr. Standard's office, and he was with his wife, and I believe that they both signed the articles of agreement. Mr. Standard at that time indicated to the Perleys, Mr. Osborne has not signed this agreement. Mr. Osborne has not provided me with the earnest money. I believe it was a day later, March 9th, Mr. Osborne came into the office of Mr. Standard. Mr. Osborne signed the articles of agreement. That's not an issue at factor. He did sign the articles. Immediately after signing the articles, he said to Mr. Standard, I don't agree to the terms in this agreement. These are not the terms of my original right to repurchase. I had a three-year right to repurchase, and he specifically disagreed with the sale price. The sale price, Your Honor, is diametrically different. They originally agreed on $3 million plus 10%. The defendant, Perley, was seeking $3 million at 10% compounded for the three years that he held the property, along with additional costs for operating the property itself. My client has always maintained that he had a three-year right. He has never indicated to Mr. Perley or to anyone else that he was falling back or giving up on his three-year right. That is why he instructed his attorney at that time, number one, I don't accept the terms of this document. Number two, do not tender the articles of agreement to the Perleys. Number three, I'm not paying any earnest money under this. I have a three-year right to repurchase. I'm going to maintain it, and I'm going to exercise it. So, Your Honor, to sum up, I would disagree with the court's assessment that Mr. Osborne accepted the articles of agreement. What about the signing? What about the signing? Your Honor, I believe it's the same thing as a document being presented to an individual. They don't read it. They sign it. Then they say, you know what, wait a second. It's not even my name. Tear it up. Get rid of it. I think... So signing it meant nothing. I don't believe that's the way we should view it, Your Honor. I believe the signing is not what controls here. I believe it's the overt action of Mr. Osborne. Although he signed the document, immediate thereafter, we're not saying three days, two hours. Within 30 seconds, he said, you know what, I don't agree to these terms. I don't accept it. Well, let me ask you this. Let's give the... Let's assume I agree with what you just said. At what point during the three years from April... My understanding is the original sale was April 20th of 2000. At what time, at what point between April of 2003, did your client do something to exercise his option? Assuming, he says, I got a three-year option, at what point and how did he exercise that option? That is a very good question, Your Honor. The problem that we have here is that the property was sold. The property was sold shortly thereafter, March 22nd, 2002. My client was prevented from actually exercising his three-year right in April of 2003. He couldn't take any action. Well, did he... Did he have a conversation with the defendant in this case where he was asked, are you going to buy the property? And he said no. Did that happen? On March 22nd, 2002... I do apologize. I believe Mr. Purley drove with his brother to Osborne's farm and asked him, are you going to purchase the property? And my client stated to him, I am not purchasing the property under the terms of the agreement. He's always maintained his three-year right to repurchase. He retained the three-year right to repurchase. That was his intention. He was not going to purchase under the articles. If you have a three-year right to repurchase, aren't you obligated legally to tender something or to do something to show that you're exercising that right? I mean, under your view, the right, because of the sale, the right is in perpetuity then? You can exercise it five years later, eight years later? Absolutely not, Your Honor. I believe that Mr. Osborne would have had to take some type of affirmative action before April 20th of 2003. He had up until that time to either tender a written notice or at least to orally notify Mr. Purley that I intend to exercise my three-year right to repurchase. When was the property sold by Purley to a third party? I apologize. It was May of 2002, I know. I believe so, Your Honor. I don't know the specific date offhand. And that was after the conversation that he wasn't going to buy it, right? I believe that was shortly after the conversation that Mr. Osborne indicated he wouldn't purchase under the articles, the terms of the articles, Your Honor. I understand. You have two minutes. Thank you. The second portion, I believe that the trial court erred by deciding that there was an accord and satisfaction. Number one, the accord, which they view as the actual articles of agreement, does not refer to the right to repurchase at all. There was no valid consideration for that document. It's our position that Mr. Purley was always obligated to actually honor the three-year right. He has not. And to come back with articles of agreement, that does not suffice. I don't believe the article was binding. It's our view that it's not binding on the party simply because it was never tendered, delivered, or accepted. No satisfaction ever occurred. The only way that satisfaction could have occurred here is if Mr. Purley permitted Mr. Osborne to exercise his right to repurchase. That is why I believe that the trial court erred by granting the accord and satisfaction. And that combines with the ultimate issue in this matter, whether or not a three-year or a two-year right to repurchase existed. The court improperly decided that so that it could decide that accord and satisfaction happened. That was improper. A jury needed to decide that. To finish up, the intent controlled here on the accord and satisfaction. Mr. Purley's intent in the record was, I want to sell it. Mr. Osborne's intent was, I want to exercise my three-year right. That's why I would ask this court to remand this to be tried in a jury in front of Mr. Osborne's peers. Thank you. Thank you, Mr. Rahola. Mr. Robertson, you may respond. May it please the court, Mr. Rahola, Doug Mustaine and I on behalf of the Purleys. At the outset, there's one thing I guess I concur with. This is a classic case of fraud. The question is, on which side of the caption does the fraud exist? Console argues that Mr. Osborne made statements to Mr. Standard. You can search the record in vain for those statements because Mr. Standard claimed privilege for them at his deposition. The other thing that obviously is going on here is that after Mr. Osborne indicated he was not going to repurchase the farm, the Purleys sold it at a profit because values were improving. But that doesn't necessarily suggest that Mr. Purley should have been paying his 7 or 8 percent mortgage at the bank for three years, compounded so that he could then have a loss in reselling to Mr. Osborne. Our argument is essentially in four parts. I think in law school they told me to tell you what I'm going to tell you and then tell you. Before you do that, Mr. Robertson, let me ask you one question. When the trial court found that there was a court in satisfaction, where's the satisfaction? There was a court, but where's the satisfaction? The satisfaction occurs when the Purleys deliver the signed document to Mr. Osborne's attorney, Jim Standard, because at that point the Purleys were obligated to sell on those terms if Mr. Osborne tendered the purchase price. And Mr. Osborne testified to that, and he's correct. If this court had that case in front of it, then the Purleys would be in real trouble because they had signed off on the terms of the agreement and tendered their undertaking to Mr. Osborne through his attorney. They signed, they negotiated, they had the accord. The satisfaction occurs with the delivery of the document to the attorney, which binds the Purleys to sell on those terms if Mr. Osborne performs. That is the definition of an option. Well, but if you've got a contract, if the accord is entering into a contract to purchase or sell real estate, the satisfaction would be completing the transaction, wouldn't it? Well, the problem is you have separated the agreement to sell with the accord on what the terms of the option were. The disagreement prior to the accord was what are the terms of the option. Is it a three-year option? Is it a two-year option? The disagreement was whether there was an option at all, right? Your client said there was no option. That didn't happen. Our client said they orally agreed to a two-year option, undisputed. Set it in their depositions. It was not written. There was a statute of frauds issue if you get into the terms of it, but that was the purpose of the meeting with Mr. Osborne and his attorney was to resolve what those disputed terms were. That's not what I'm saying. That's what Mr. Osborne said in his deposition. And Mr. Osborne further said in his deposition that as a result of that meeting, his attorney typed up the purchase terms for the option which had been agreed to. It was typed up in the form of a real estate purchase agreement, but once the Perleys tendered that agreement, they were bound to sell if Mr. Osborne performed. That's the delivery. That is the satisfaction. The real problem in this case is that Mr. Osborne throughout the course of this entire set of transactions in this litigation says one thing, means another. He has secret intentions, but the real problem with his position on appeal is that our entire defense is based on seven admissions that Mr. Osborne made in his deposition. Don't listen to me telling you what Mr. Osborne said. Don't listen to Mr. Barhola. The admissions are attached to our brief. Read them because I believe they're clear, they're unequivocal, and they really give substance to this matter. Those are very briefly as follows. In 2001, Mr. Osborne, whose attorney says that he always intended to have a three-year option, mails and signs for the Perleys a proposed agreement to confirm his two-year option. If you look at SA-26 attached to our brief, you'll see that at that time Mr. Osborne signed a document to confirm his two-year purchase option to expire. He even put in the date, April 20, 2002. In March of 2002, as the two-year purchase date approaches or has actually arrived, Mr. Perley goes to Osborne and says, are you going to exercise the two-year option? This is Mr. Osborne's testimony. That was what Perley did. Third point, that's SA-8. Osborne, his attorney, and Perley meet, quote, The purpose of the meeting with Osborne and his attorney was to resolve the disputed terms for the buyback. Four, Mr. Osborne acknowledges that the agreement which his attorney prepared reflected the agreement, quote, to resolve the dispute regarding the buyback, close quote, SA-11 and 12. Fifth, the Perleys signed the agreement and deliver it to Mr. Osborne's attorney. And I believe that Mr. Osborne was correct. Legally, when the Perleys signed that, they were also bound by the accord and satisfaction because it set the terms for the buyback. Six, when Osborne did not tender $10,000 or return a signed agreement, Jim Perley went to Osborne and asked him specifically, would he buy the farm back? And if you read the transcript, you'll see that initially he said unequivocally, no, I wasn't going to say anything. Then after he meets with his attorneys and we reconvene and there's more testimony, you'll find later in the deposition he says, well, I think I said no, not on those terms. Which record page on that? The SA-14 through 20 in our supplemental appendix. Again, I don't want to tell the court what Mr. Osborne said because I'll characterize it. But if you read it, it's pretty unequivocal. And then what does Mr. Osborne do after that? Mr. Perley goes and he makes arrangements to sell the farm. Osborne then sees surveyors and potential buyers. And do you know what he does? What he admits doing? Absolutely nothing. As a matter of fact, if you want to search this record for Mr. Osborne's assertions about his three-year option, you will find that nowhere is it in writing, either in a letter from him or a memo or an angry whatever. He never puts it in writing, only in two years that he ever puts it in writing. He never says it to anyone. He never tells Perley, well, you know, I've decided no, I'm going to stick with my three-year option. He didn't say that. So when we put our section in the brief about secret intentions, there's a game being played here. Well, it must be fair. This case has been thrown out on the statute of frauds. The trial court made a specific finding that your client, Mr. Osborne, I believe it was, when he came back and said, oh, the bank won't loan money if this option is contained in the sale contract. You've been reading briefs instead of records, Judge. That one didn't occur. What the trial court ruled in a prior motion, prior to our taking Mr. Osborne's deposition, was that he was going to let Mr. Osborne proceed trying to prove fraud by oral evidence. That's what the trial court ruled. The trial court did not rule that Mr. Osborne had been hoodwinked. The trial court let it go forward on that theory. That predates the accord and satisfaction. It predates Mr. Osborne's admissions that I've just discussed. So in reality, that all washes out with the accord and satisfaction. The reason we have an accord and satisfaction is because the parties had an oral agreement with a dispute about how long it was and what the price terms were. Well, an oral auction to purchase real estate normally is no good, is it? Normally it's no good unless it's induced by fraud. There were lots of allegations of fraud. There were affidavits submitted. The affidavit of Mr. Osborne that he submitted was quite different than what he said in his discovery deposition. But under state law, his discovery deposition is binding. The reason why is because of his discovery deposition, we finally got the chance to go through the documents and the record that he created and everything that had led up to that point. So that statement, that's one of the major issues we have with the reply brief. That's not what he filed. In the record, did your client agree to saying that the bank wouldn't loan the money with that provision in the sale contract? I believe that if I recall correctly, he said something to the effect that he had concerns about the bank loaning the money. The bank was going to loan the money with or without it, but it's not an issue. That would be a plus for the bank, not a negative, right? What, a buyback agreement? Sure. If they're laying a mortgage out, could there be a plus, not a negative? Well, would it be a plus for Mr. Perley to have an oral agreement to sell over a three-year term, pay 8%, 9% to the bank, and then sell it back at 10% total? I don't know, but I was looking for an answer to my question. My question is, wouldn't it be a plus for the bank? I mean, why would a bank not loan money just because there's a buyback agreement? If anything else, that protects their mortgage. Well, it depends on the financial resources of the person who has the buyback agreement. At this particular time, I don't believe Mr. Osborne had the resources to do the buyback agreement because if you read his deposition, he was heavily invested in his son's scientific company. Well, it couldn't hurt, could it? It depends on how the bank feels about Mr. Osborne. That's not in the record. I mean, I can speculate about it, but I don't think it helps us. Four rules of law that I think control here. One, if affirmative defenses are established by uncontroverted evidence, the defendant wins. Second, on summary judgment, Mr. Osborne is bound by the statements that he makes in his sworn testimony in his deposition. Third point, secret intentions don't matter. We hear repeatedly about Mr. Osborne always intended to maintain this 3-year option. He never told anybody that, and he admits he never told anybody that. If you read his testimony, it was his secret intention. And the last is that only an option contract binds the seller to buy on certain terms but not the purchaser to proceed. Counselor, you have two minutes. Thank you. You can read our brief for the five elements of accord and satisfaction. We think they're all here. You can read our brief about the six elements of promissory estoppel. You will find a gigantic typo. Someone deleted the fifth element, reasonable reliance. It should be in there. But if you go to page 21 of our brief, I think you can fill in the quote correctly. How do you describe that as a typo? For reasons that are attributable to me, we had to submit this brief twice, and somehow going through the word processor, things disappear and I don't understand it. At the end of the day, three big issues that we have with the reply brief and with Mr. Osborne's approach in this case. The first is, and we talked about this, the trial court never ruled that Osborne had a three-year right to repurchase. The trial court ruled that he had a right to pursue that claim, and that was before the depositions. The second thing is, the trial court never said that Mr. Osborne's 2001 letter that he signed and delivered that said he had a two-year option, trial court never said that that was not an admission. Trial court ruled it was not a judicial admission. I still think it's a judicial admission, but that's not where we are right now on the record. But it's clearly an uncontradicted admission that that's what he put in writing at that time. And the last thing is, repeatedly we hear that Mr. Osborne reserved or preserved his right to a three-year option, but if you read his testimony, he never told anyone about it. And if you read the boxes of documents that have been exchanged in this case, after he sold to Perlee and at the time he sold to Perlee, that is never in writing in any way, shape, or form. As a matter of law, the trial court should be affirmed, summary judgment was properly entered in this case. Sadly for Mr. Osborne, he sold the family farm, and sadly for Mr. Osborne, he tried to play a game. But at the end, he didn't perform an agreement that his attorney had very artfully drafted for him, which incorporated the option terms. And he also, when the last chance occurred, when Mr. Perlee, we keep vilifying the Perlees in all this, Jim Perlee goes out and says, Mr. Osborne, are you going to buy the farm? And what he gets, thank you, what he gets is an unequivocal no. That should be your response to the plaintiff in this case. Thank you. Thank you, Mr. Robertson. Mr. Valholla, you may reply. Thank you, Your Honor. Before you reply, let me ask you one quick question. That is, what relief, let's suppose, what relief, because the property's gone, right? What relief have you got? I believe we would be seeking the value of the property and any profits made off the property, Your Honor. I'll be very short and sweet. The drama that we just heard is unnecessary. Counsel's correct. This is a matter of fraud. There is fraud here. And there is also a secret intention. I've already explained, briefly explained, it's an oral agreement, an oral right to repurchase. The parties take two different positions. It's our position that Mr. Perlee had a profit motive here. It benefited him to claim a two-year right to repurchase. He had a buyer, a willing buyer, in March of 2002. Why did your client sign a statement that it was a two-year option? The letter, Your Honor, that was being referred to, the February 20, 2001 letter, that was sent to Mr. Perlee because Mr. Osborne was very concerned that Mr. Perlee was not going to honor the agreement. I believe that dryers were going to be moved. The property was being mined. That was part of the agreement back in 2000 that the property would not be altered. Those were his subjective feelings, but why was there a mention of a two-year option? What he did, Your Honors, he sent a letter. The letter is in the evidence. The letter was sent so that he could get Mr. Perlee to either acknowledge a three-year or a two-year. He had no confirmation of what's going on. He sees that the property is being changed. He's got a feeling that the property is going to be taken from him. So what he did was he included a draft contract in there. It's a draft contract. I believe it had a two-year limit in there, but it wasn't signed, and it wasn't accepted. Is there anywhere, in one place in this record, where your client put in writing a three-year contract? Whether or not there's a written document that sets forth the three-year? I don't care if it's a contract, a letter to Mr. Perlee. Well, I'll tell you what, Your Honor, that's why in my reply brief, because I believe the counsel opened the door on this, there is a litany of affidavits from several witnesses that have heard from either Mr. Perlee or from Mr. Osborne or witnessed that there was, in fact, a three-year right to repurchase. Well, where's that in the record? Where's that in the record, Your Honor? Your Honor, I believe, I don't have the specific numbers in front of me, but it is in the record. I specifically list out the specific sections. I believe the affidavits were attached to a previous motion for summary judgment. But it's my understanding that the common law record would include everything. Now, on this letter, the letter says Jim Osborne has a guaranteed option for two years to buy back the farm from Jim Perlee. And then the next page is signed by Jim and Brian Osborne. Okay. Now, how do you characterize that? It says Jim Osborne has a guaranteed option for two years to buy back the farm from Jim Perlee. You're soliciting some information. I characterize it as a letter that was being sent by Mr. Osborne to Mr. Perlee to get him to at least acknowledge that there was a right to repurchase out there, Your Honor. What was the date of that letter? February 20th of 2001. And when was the property sold? The property was sold, I believe, May of 2002. May of 2002. No, no, no, no. Originally. April of 2000. Oh, April of 2000. April 20th of 2001. Excuse me, Counselor, I'll listen to you. What did you say it was? April 20th of 2000, Your Honor. Okay. All right. Let me add the deposition, talking about this April discussion between your client and Perlee's. I mean, your client was asked directly, is it safe to say that he wanted a direct answer from you whether or not you were going to buy the farm or not? Answer, I told him no. Correct. And the record also contains a clarification. I told him no, not under the terms of those articles. And Your Honor, what I think Well, the question was also asked, so during that discussion, you never said to him, oh, I still have a three-year option. Did you answer? I didn't say anything. I don't believe he was required to say anything at that time, Your Honor. He's always had the three-year right to repurchase. He has witnesses of the three-year right to repurchase. Counselor, could you point me to him? What I want to point out is He is saying in his letter he had two years remaining to repurchase. I don't believe he did, Your Honor. And as clarification, the trial court took a look at that letter and did not find it as an admission. As a matter of fact, the trial court ruled that nowhere in that letter did Mr. Osborne admit that he had a two-year right to repurchase. I think that's very important because that is already a finding by the court at that time. I want to sum up That's the sentence. Jim Osborne has a guaranteed option for two years to buy back the farm from Jim Purley. Jim Purley took title of the farm on 4-20. And the option would then There's something like marked down that says on 4-20-02. Correct. And the farm is purchased 4-20-2000. Yes, Your Honor. And he gives the date there, 4-20-02. Still the document's not binding, Your Honor. I'd like to clarify satisfaction. As a verbal agreement, is that what you're referring to? No, you're referring to the 2000, you're referring to the February 20, 2001 letter, correct? I'm referring to the, it's on SA-26, CA-12. And I believe that that's the letter. And it's my position that that's not a binding agreement. I'm not talking about if it's a binding agreement. I just wonder why those statements were there from your client. And once again, I'm reiterating once again, my client was doing everything in his power to get the other side to acknowledge that he had a right to repurchase. That is not an equivocal admission that he had a two-year right to repurchase. What I'd like to clarify with respect to satisfaction is, it's the agreement to do a thing in consideration of a settlement of a claim that is not satisfying. That here is not the terms of the right to repurchase. It's the actual purchase. Counselor, your time is up. My client was prevented from making that purchase. I would ask the court to remand this and let the trial court give Mr. Osborne his day in court. Thank you, Your Honor. Thank you, Mr. Verhoeven. Thank you, Mr. Robertson, Mr. Mustang, for your arguments in this matter this morning. We'll be taking under advisement a written disposition shall issue.